THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRIAN GITTINGS, Defendant-Appellant.

First District (5th Division)   No. 84—0745

Opinion filed September 6, 1985.

Richard S. Kling, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Edward V. Edens, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE MEJDA delivered the opinion of the court:

Defendant, Brian Gittings, was charged with reckless homicide (Ill. Rev. Stat. 1981, ch. 38, par. 9—3(a)). Following a bench trial, the defendant was found guilty and was sentenced to a prison term of one year. Defendant appeals his conviction contending that (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt because (a) there was no evidence that defendant drove his vehicle in a reckless manner and (b) the death of the victim, Richard Thompson, was the result of an intervening cause; and (2) the trial court abused its discretion in sentencing the defendant to a one-year prison term in light of mitigative circumstances. We affirm.

At trial, Mark Thompson, the victim's brother, testified that he last saw his brother at 7 p.m. on March 6, 1982. At that time, the victim and the defendant, who were close friends, stopped by the Suburban Medical Center in Hoffman Estates to visit with the witness and his wife and to see their newborn baby. Mark noticed that the

defendant's speech was slurred and that the victim stuttered and weaved as he walked. The defendant told Mark that they had been to a boat show and then had gone drinking at a bar called the Assembly, also in Hoffman Estates. The witness, a former bartender, stated that both men were intoxicated. Before the two men left the hospital to return to the Assembly, the defendant told Mark that he, and not the victim, would be driving. The two left the hospital about 7:30 p.m.

Defendant later told Officer Edgar Fair that the two men returned to the Assembly for drinks. After leaving the bar around 8:30 p.m., the defendant set out to drive the victim to his home in Lake in the Hills. He drove westbound on Route 62 and turned right onto Sutton Road just prior to the accident.

At approximately 9 p.m., Officer Gary Dembek of the Barrington Hills Police Department was traveling eastbound on Route 62. His radar registered a vehicle moving at 69 miles per hour in this 55-mile-per-hour zone. The vehicle's speed increased to 71 miles per hour. Dembek activated the red lights on top of his vehicle and turned around to pursue the speeding vehicle. He followed the vehicle as it turned right onto Sutton Road at a faster than normal speed. This portion of Sutton Road has several small hills and several curves. Once on Sutton Road, the vehicle was one-eighth mile ahead of Dembek's vehicle. The vehicle then accelerated, in Dembek's opinion, to a speed in excess of 80 to 85 miles per hour. At this point, he lost sight of the vehicle. As he continued to pursue the vehicle, Dembek's speed on the curves was 60 to 65 miles per hour and on the straight portion of the road was 85 to 90 miles per hour.

Dembek observed small tree branches lying in the roadway at one point. Upon reaching the place where Sutton Road dead-ends, he stopped and returned to the area where the tree branches were down. He estimated that approximately a minute and a half elapsed from the time he first saw the branches in the road until he returned to where they had fallen. When he went back to this spot, he saw a vehicle in a ravine 20 feet below the road. He found the victim lying with his feet on the passenger side of the vehicle and the remainder of his body lying on the ground outside the vehicle. The victim was unconscious and was gasping for breath. The vehicle appeared to be the same vehicle that the officer had been pursuing.

About 11 p.m., Dembek returned to the accident site and observed a set of footprints leading away from the site. There were no road defects or obstructions in the road in this area. The speed limit near the accident site was 35 miles per hour with a 20-mile-per-hour cautionary speed limit on the curves. On cross-examination, Dembek

stated that when the vehicle he was following passed him on Route 62, he noticed that it was a full-sized vehicle with square taillights. Sutton Road was unlit that night except for his own headlights. There were no other vehicles on the road at the time.

At 2:30 a.m. on March 7, Officer Fair and a Deputy Sanders went to the defendant's residence. The defendant had small cuts and scratches all over his body and his nose appeared to be broken. Upon Fair's request, the defendant produced the clothes he had worn the night before. His trousers and tennis shoes were wet. Both his jacket and trousers had small tears all over them. The front of defendant's jacket was smeared with what appeared to be blood. Fair read the defendant the *Miranda* warnings. Defendant then told Fair and Sanders that he was driving the vehicle at the time of the accident. He did not see the red lights on Officer Dembek's vehicle. After the accident, the defendant left the scene, ran through the fields to the highway and hitchhiked home. He fled the scene because he was scared.

Dr. Benjamin LeCompte first saw the victim in the emergency room following the accident. The victim was unconscious but responded to painful stimulation of his extremities. According to Dr. LeCompte, the victim suffered a severe brain stem contusion and a cortical infarction, or stroke, on the left side of his brain. He stated that a high-speed motor vehicle accident could cause these injuries. When the victim was discharged from the hospital, he did not respond to his environment and could not function by himself without nursing care. After his discharge, the victim was admitted to a Veterans Administration Hospital.

On June 25, the victim entered a nursing home where he died on July 17. Dr. LeCompte stated that the pulmonary embolus, or blood clot of the pulmonary artery, which caused the victim's death resulted from prolonged immobilization and chronic bed rest. The immobilization and bed rest were the result of the brain injuries the victim sustained. The nursing home records did not disclose whether the victim was turned regularly to prevent clotting. According to Dr. LeCompte, however, even if a patient receives the best nursing care, a pulmonary embolism may still occur.

Dr. Mitra Kalelkar, Cook County Medical Examiner, testified that an internal examination of the victim disclosed that he had suffered blunt trauma about the head. Due to this trauma, the victim developed cortical contusions on the left side of his brain. The cause of death, however, was a massive pulmonary embolism complicated by craniocerebral injuries. The embolism was caused by the sluggish cir-

culation of blood in the victim's system.

Judith Dincher, a registered nurse, testified on the defendant's behalf. She stated that certain medications or immobility can cause blood clots to form. Dincher described a pulmonary embolism as a classic complication of immobility. Patients such as the victim require frequent change of position to improve circulation. If the victim did not receive this care, it is possible that blood clots could have formed. The proper level of nursing care can reduce the likelihood that clotting will occur. Clotting is not inevitable, however, simply because a patient is immobile.

After reviewing the evidence, the court found the defendant guilty of reckless homicide. The court sentenced the defendant to a one-year prison term. Defendant appeals.

I

Defendant first contends that the evidence failed to establish his guilt beyond a reasonable doubt because there is no evidence that he drove his vehicle in a reckless manner and because the victim's death was the result of an intervening cause.

A

■ A person commits reckless homicide if, while driving a motor vehicle, he unintentionally kills an individual and the acts which caused the death are performed recklessly so as to create a likelihood of death or great bodily harm to some person. (Ill. Rev. Stat. 1981, ch. 38, par. 9—3(a).) A person acts recklessly in this regard when he consciously disregards a substantial and unjustifiable risk that his acts are such as are likely to cause death or great bodily harm to some individual and where such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in such a situation. (*People v. Bonzi* (1978), 65 Ill. App. 3d 927, 931, 382 N.E.2d 1300.) The mental state of recklessness is to be inferred from all of the facts and circumstances in the record and whether the given conduct is reckless is a fact question for the trier of fact to decide. *People v. Hawn* (1981), 99 Ill. App. 3d 334, 338, 425 N.E.2d 1024.

It is the defendant's position that the evidence failed to prove that he drove his vehicle in a reckless manner because there was no evidence that the vehicle which Officer Dembek was pursuing was the defendant's vehicle. We disagree. Defendant stated that the vehicle he was driving was traveling the same route at approximately the same time as the vehicle Dembek was pursuing. Dembek observed that the vehicle he was following was full-sized and had square taillights, the

same as the defendant's vehicle. The accident site was only a short distance from the point where Dembek lost sight of the vehicle. After first passing the site, only a minute and a half passed until he returned to the site. No other vehicles were in the area at the time. In weighing the evidence, the trier of fact is not required to disregard the natural inferences that flow normally from the evidence. (*People v. Bell* (1981), 96 Ill. App. 3d 857, 864, 421 N.E.2d 1351.) We will not substitute our judgment for that of the trial court on questions involving evidentiary inferences, for the law commits to the trier of fact the determination of these questions. (*People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733.) We find that this evidence established that the vehicle Dembek was pursuing was the defendant's vehicle.

Defendant correctly argues that excessive speed, by itself, is not always sufficient to sustain a conviction for reckless homicide. (See *People v. Ziegler* (1979), 78 Ill. App. 3d 490, 496, 396 N.E.2d 1160.) While speed alone may be insufficient to sustain a conviction, speed combined with other circumstances which indicate a conscious disregard of a substantial risk likely to cause death or great bodily harm to others is sufficient. (*People v. Boyle* (1979), 78 Ill. App. 3d 791, 797, 396 N.E.2d 1347; see also *People v. Griffith* (1978), 56 Ill. App. 3d 747, 372 N.E.2d 404 (evidence of speeding in residential neighborhood was sufficient to sustain charge of reckless homicide).) The *indicium* of conscious disregard need not be shown solely by the maneuvering of the motor vehicle. It may include the physical condition of the driver. (*People v. Boyle* (1979), 78 Ill. App. 3d 791, 797, 396 N.E.2d 1347.) Evidence of a driver's intoxication has often been held probative on the issue of recklessness. *People v. Miller* (1979), 75 Ill. App. 3d 775, 777-78, 394 N.E.2d 783.

*People v. Chambers* (1972), 8 Ill. App. 3d 430, 289 N.E.2d 476, is illustrative of the probative value of intoxication. The *Chambers* court reasoned that the fact that the defendant was guilty of improperly overtaking the car on his right did not by itself establish that his conduct was reckless. If defendant was intoxicated, however, the court indicated that he would have been acting recklessly in driving as he did under the prevailing snowy weather conditions. Because the State failed to introduce any evidence of the defendant's intoxication, the court reversed the defendant's conviction and remanded the cause for a new trial. 8 Ill. App. 3d 430, 435, 289 N.E.2d 476.

In the instant case, defendant was traveling at speeds in excess of 80 to 85 miles per hour on a road marked with a 35-mile-per-hour speed limit and a 20-mile-per-hour cautionary speed limit on the curves. Dembek was unable to catch up to the defendant even at

speeds of 60 to 65 miles per hour on the curves and 85 to 90 miles per hour on the straight portions of the road. By his own admission, the defendant had been drinking at the Assembly bar both before he stopped at the hospital and after he left the hospital. Mark Thompson, a former bartender, testified that defendant's speech was slurred and that he was intoxicated. We believe that defendant's conduct as he traveled this hilly, curvy road at high speeds while in an intoxicated state demonstrates an utter disregard for the safety of the victim. His conduct certainly evidences a gross deviation from the care a reasonable person would exercise in such circumstances.

B

■■ Defendant contends that the State failed to prove beyond a reasonable doubt that the victim's death was not the result of an intervening cause.

As a part of the *corpus delecti*, the prosecution must establish that death resulted from a criminal agency. (*People v. Wilson* (1948), 400 Ill. 461, 480, 81 N.E.2d 211.) Once the State has shown "the existence, through the act of the accused, of a sufficient cause of death, the death is presumed to have resulted from such act, unless it appears death was caused by a supervening act disconnected from any act of the defendant." *People v. Meyers* (1945), 392 Ill. 355, 359, 64 N.E.2d 531; see also *People v. Brown* (1973), 9 Ill. App. 3d 730, 293 N.E.2d 1.

Defendant argues that the failure of the nursing home to regularly turn the victim while he was immobile in bed constituted unskillful medical treatment relieving him of criminal liability. We have read the record and have determined that it contains no evidence of the care the victim received while in the nursing home. Dr. LeCompte was unable to decipher the nursing home records. Even if the records reflected that the victim had received the best care possible, according to Dr. LeCompte, a pulmonary embolism could still have occurred. Dincher testified that a pulmonary embolism is a classic complication of immobility. Dr. LeCompte stated that the victim's immobilization and bed rest were the result of the brain injuries he sustained. It is apparent that the pulmonary embolism resulted directly from the immobilization and bed rest required as a consequence of the victim's brain injuries caused by the accident. There was no separate intervening act disconnected from the injury inflicted in the accident which would relieve the defendant from liability. We believe that the defendant was proven guilty beyond a reasonable doubt.

## II

■ The last issue for resolution concerns the propriety of the trial court's sentencing the defendant to a one-year prison term.

Our supreme court has established that sentencing is a matter of discretion and that, absent an abuse of discretion, a sentence may not be altered on review. (*People v. Willingham* (1982), 89 Ill. 2d 352, 364, 432 N.E.2d 861; *People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541.) It is not our function to serve as a sentencing court; thus, a sentence imposed within the statutory limits will not be reduced merely because we, as a reviewing court, might have imposed a different punishment. *People v. Perruquet* (1977), 68 Ill. 2d 149, 156, 368 N.E.2d 882.

Reckless homicide is a Class 4 felony. (Ill. Rev. Stat. 1981, ch. 38, par. 9—3(b)(2).) The permissible sentence ranges from a one- to a three-year term of imprisonment. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(7).) It is clear that the trial court did not transcend the prescribed statutory framework by sentencing the defendant to a one-year term of imprisonment.

The defendant contends that the trial court abused its discretion by failing to consider exceptional mitigating factors and the defendant's rehabilitative potential both at the time of the original sentencing and at a later hearing to modify the sentence. Defendant argues that factors such as the absence of a prior criminal record, the likelihood that this conduct will not recur and the unlikely chance that defendant will commit another crime are mitigating factors which the trial court did not consider.

Our review of the record reveals that the trial court considered these factors. The court noted that defendant was young, that he had been gainfully employed since age 16, and that this accident was an isolated incident. The court commented on the defendant's remorse over causing the death of the victim who was his friend. Despite these mitigative circumstances, we believe the trial court did not abuse its discretion in sentencing the defendant as it did.

Section 5—6—1 of the Unified Code of Corrections provides in relevant part:

> "Sentence of Probation and of Conditional Discharge and Disposition of Supervision. (a) Except when specifically prohibited by other provisions of this Code, the court shall impose a sentence of probation or conditional discharge upon an offender unless, having regard to the nature and circumstances of the offense, and to the history, character and condition of the offender, the court is of the opinion that:

(1) his imprisonment or periodic imprisonment is necessary for the protection of the public; or

(2) probation or conditional discharge would deprecate the seriousness of the offender's conduct and would be inconsistent with the ends of justice." Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—1(a).

In view of this statutory provision, whenever a sentence of imprisonment or periodic imprisonment is imposed, the record must indicate that the judge is of the opinion that imprisonment is necessary for the protection of the public or that probation or conditional discharge would deprecate the seriousness of the offender's conduct and would be inconsistent with the ends of justice. (*People v. Cox* (1980), 82 Ill. 2d 268, 281, 412 N.E.2d 541.) Substantial compliance with section 5—6—1 may exist even if the judge does not specifically say that "imprisonment is necessary for the protection of the public" or that "probation or conditional discharge would deprecate the seriousness of the offender's conduct and would be inconsistent with the ends of justice." 82 Ill. 2d 268, 281, 412 N.E.2d 541.

In this case the trial court referred to section 5—6—1 and stated that he had considered its requirement. Although the trial judge did not use the exact words of the statute, it is clear the seriousness of the offense troubled the court and weighed heavily in its decision to impose a prison term. We find that there was substantial compliance with the statute and that the trial court did not abuse its discretion in sentencing the defendant to a one-year term of imprisonment.

For the aforementioned reasons, the defendant's conviction is affirmed.

Affirmed.

SULLIVAN and PINCHAM, JJ., concur.